USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: __9/28/20_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
   JUAN CARLOS BARDALES,            :
                                              :
                          Plaintiff,  :
   -against-                            :       1:17-cv-8897 (ALC)
                                            :
                                            :       __OPINION AND ORDER__
                                            :
                                            :
   CONSULATE GENERAL OF PERU IN NEW  :
   YORK et al,                           :
                          Defendants.  :
                                            :
                                            :
                                            :
------------------------------------------------------------x
ANDREW L. CARTER, JR., United States District Judge:

      Before the court is Defendants' motion to dismiss Plaintiff's Second Amended Complaint

("SAC") for lack of subject matter jurisdiction and failure to state a claim upon which relief can

be granted. (ECF Nos. 155–157). Defendants are the Consulate General of Peru in New York

and the former Consul General of Peru, Mario Teresa Merino Villaran de Hart ("Merino").

(Defs. Br. at 14 n.4). Plaintiff, Juan Carlos Bardales is a former employee of the Consulate.

      For the reasons that follow, Defendants' motion is GRANTED.

## I. Factual Background

      Bardales is an American citizen living in New York. (SAC ¶ 15). Bardales worked at the

Consulate General of Peru in New York from May 2010 until October 31, 2015. (*Id.* ¶¶ 34–35).

Initially, Bardales worked in customer service at the Consulate, performing administrative work.

(*Id.* ¶ 47). From 2010 to 2012, he was required by contract to work from 9:00 a.m. to 3:00 p.m.

Monday through Friday. (*Id.* ¶ 68). From 9 a.m. to 3 p.m., Bardless stood outside a "work

window" behind a counter at the Consulate answering inquiries from the public. (*Id.* ¶ 48). At 3

1

p.m., Bardales would leave the counter and spend additional time performing his administrative duties. (*Id.* ¶ 49). During this time, Plaintiff complained that he was required to work extra hours without overtime pay, noting that he worked in excess of 40 hours a week. (*Id.* ¶¶ 50–51).

In May 2013, the nature of Bardales's work at the Consulate changed. He began working as a personal assistant to Merino, an Ambassador in the Diplomatic Service of Peru and the Consul General of Peru in New York. (*Id.* ¶¶ 25, 52). By contract, Bardales was required to work from 9:00 a.m. to 5:00 p.m. Monday through Friday, and beginning in 2014, also the third Saturday of every month from 9:00 a.m. to 1:00 p.m. (*Id.* ¶¶ 69–70).

In theory, Bardales's employment time was to be split equally between his administrative and personal assistant work. (*Id.* ¶ 53). However, because of the demands Merino placed on him, Bardales provides that he spent approximately 60% of his time working for Merino. (*Id.* ¶ 54; Bardales Decl. ¶ 9). Bardales alleges that Merino would regularly engage his services until 11:00 p.m. and require him to drive her home at the end of the day and pay for his own transportation from her home. (*Id.* ¶ 63). Although not in his complaint, in his declaration, Bardales states that he also performed some maintenance work on behalf of the Consulate. (Bardales Decl. ¶ 9–10).

Bardales describes the work he performed for Merino as "personal" in nature. (*Id.* ¶ 55). He alleges he drove her "to the gym, the supermarket and to clothing stores" and "chauffeur[ed]" her children, friends, and other relatives "when they were in New York City…so they could enjoy various tourist attractions." (*Id.* ¶¶ 56–62). Bardales alleges that approximately 60% of the individuals he chauffeured did not work on behalf of the Consulate. (*Id.* ¶ 63).

Bardales alleges he never received overtime pay, only a fixed monthly salary, despite exceeding the hours he was expected to work regularly. Bardales was never asked to "clock in" or to use any other formal method to account for his hours. (*Id.* ¶¶ 64–67). By virtue of his

chauffeuring work for Merino, Bardales additionally "incurred expenses including, but not limited to, parking, parking tickets, tolls and gas." (*Id.* ¶ 77). To obtain reimbursement for these expenses, Defendants allegedly required Bardales to "sign a false receipt stating that the reimbursement was in fact for overtime pay." (*Id.* ¶ 80).

On October 6, 2015, Bardales allegedly complained to Merino about the fact that he was not receiving overtime. (*Id.* ¶ 84). In response to this request, Defendants allegedly informed Bardales that his employment contract would be terminated at the end of the month. (*Id.* ¶ 87).

## II. Procedural Background

Bardales commenced this action on November 15, 2017. (ECF No. 1). He amended his complaint on January 18, 2018. (ECF No. 3). On April 19, 2019, with leave of the Court, Defendants filed a motion to dismiss the Amended Complaint. (ECF No. 113). Attached to his opposition, Plaintiff submitted a Second Amended Complaint without receiving Court authorization. (ECF Nos. 123 and 125). The Court held a status conference on December 11, 2019, at which it granted Plaintiff leave to file his Second Amended Complaint ("SAC"). (ECF No. 153). Bardales filed his SAC on December 19, 2019, alleging violations of the Fair Labor Standards Act and New York Labor Law, as well as breach of contract. (ECF No. 154).

Defendants now move to dismiss Bardales's SAC for lack of subject matter jurisdiction. They argue that the Consulate is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–11, and that no statutory exception to this immunity applies. Additionally, Defendants argue that Merino is immune under the Vienna Convention on Consular Relations ("VCCR"), 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261. Alternatively, Defendants argue dismissal of Counts Three, Four, and Five is appropriate under Fed. R. Civ. P. 12(b)(6) because Plaintiff failed to state a claim upon which relief can be granted.

### III. FSIA and Commercial Activity Exception

The FSIA "is the sole source for subject matter jurisdiction over any action against a foreign state." *Pablo Star Ltd. v. Welsh Government*, 378 F. Supp. 3d 300, 306 (S.D.N.Y. 2019) (internal citations omitted). The Act defines a "foreign state" to include its "agenc[ies] and instrumentalit[ies]" like a consulate. 28 U.S.C. § 1603(a). Further, the FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless one of the limited exceptions enumerated in Sections 1605 through 1607 of the FSIA applies. 28 U.S.C. § 1604; *see Saudi Arabia v. Nelson*, 507, U.S. 349, 355 (1993); *Pablo Star Ltd.*, 378 F. Supp. at 306.

"When [a] defendant claims immunity under the FSIA and 'presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign.'" *Figueroa v. Ministry for Foreign Affairs of Sweden*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016) (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993)). Determining whether a plaintiff has satisfied his burden "involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—resolution of disputed issues of facts." *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 175 (2d Cir. 2010) (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 80 (2d Cir. 2008) (internal quotation marks and alterations omitted)). At this stage, "when considering a motion to dismiss for lack of subject matter jurisdiction on the basis of sovereign immunity, 'the Court generally must accept the material factual allegations in the complaint as true, but does not draw all reasonable

inferences in the plaintiff's favor.'" *Pablo Star Ltd.*, 378 F. Supp. at 306, quoting *Figueroa*, 22 F. Supp. 3d at 307. "[W]here jurisdictional facts are disputed, the Court has the power and obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists." *Figueroa*, 22 F. Supp. 3d at 307.

There is no dispute here that the Consulate of Peru is a foreign state within the meaning of the FSIA. (SAC at ¶ 20). In his complaint and opposition briefing, however, Bardales argues that the so-called "commercial activity" exception to sovereign immunity applies here. (*Id.* ¶ 45). Section 1605(a)(2) of the FSIA provides in relevant part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case … in which the action is based [i] upon a commercial activity carried on in the United States by the foreign state; or [ii] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [iii] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

To pursue any of these three theories, a plaintiff must show "some form of (1) a 'commercial activity' carried on by or of the foreign state (2) a nexus between the activity and the basis of the plaintiff's claims, and (3) a geographic connection with the United States." *Pablo Star Ltd.*, 378 F. Supp. 3d at 307.

As provided by the FSIA, a "commercial activity" may be "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 1603(d). The text further instructs that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* "[A] state engages in commercial activity … where it exercises only those powers that can also be exercised by private citizens as distinct from those powers peculiar to sovereigns." *Saudi Arabia*, 507 U.S. 361 at 360. Whether the foreign state acts "with a profit

motive or instead with the aim of fulfilling uniquely sovereign objectives" is irrelevant. *Figueroa*, 222 F.Supp.3d at 310 (quoting *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 177 (2d Cir. 2010)). Instead, the key inquiry is "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Id.* (internal quotation marks omitted).

The Supreme Court has provided guidance to courts for determining whether there exists a nexus between a foreign state's commercial activity and plaintiff's claims—i.e., whether a plaintiff's claim is "based upon" the relevant commercial activity. *OBB Personenverkehr AG v. Sachs*, 136 S.Ct. 390 (2015). Courts first must "identify[] the particular conduct on which the [plaintiff's] action is 'based.'" *Id.* at 395 (alterations in original) (quoting *Nelson*, 507 U.S. at 356). In doing so, courts should look at the "the gravamen of the complaint" as well as "those elements…that, if proven, would entitle a plaintiff to relief." *Id.* (alteration in original) (internal quotation marks and citations omitted). "Courts then must consider the degree of closeness that exists between the commercial activity and the gravamen of the plaintiff's complaint." *Pablo Star*, 378 F.Supp.3d at 308 (internal citations and quotation marks omitted).

Where, as here, the Plaintiff's claims are "plainly based upon the plaintiff's employment relationship with defendants," the commercial activity exception will apply only where that employment relationship "was commercial in nature." *Figueroa*, 222 F. Supp. 3d at 311.

In *Kato v. Ishihara*, the Second Circuit considered the application of the commercial activity exception in the employment context. *Kato* was also an employment case in which a Japanese citizen employed by the Tokyo Metropolitan Government ("TMG") "allege[d] that she was the victim of sexual harassment while she was stationed at TMG's New York office, and of retaliation upon her return to Tokyo." *Id.* at 109. TMG argued it was immune under the FSIA

and Plaintiff countered that the commercial activities exception applied. *Id.* The Court

"consider[ed] whether TMG's activities in New York were typical of a private party engaged in

commerce" and ultimately concluded that they were not and that American courts lacked

jurisdiction over Plaintiff's claims. *Id.* 111–12.

 "[T]his Court has read *Kato* to require two inquiries in employment cases: First, 'whether

the activity to which the plaintiff's employment was directed is governmental'; and second,

'whether the plaintiff's employment relationship was sufficiently intertwined with that activity to

provide that the employment relationship itself was part of the governmental function."

*Figueroa*, 222 F. Supp. 3d at 313 (quoting *Hijazi*, 689 F. Supp. 2d at 674–75).

Defendants' position is that the allegations in Plaintiff's complaint, combined with affidavit

and documentary evidence produced during discovery, are insufficient to overcome the

Consulate's presumptive immunity. Based on my review of the same, I conclude that the

commercial activity exception is inapplicable here and the Consulate is entitled to sovereign

immunity.

### A.  The Consulate's Employment Activities

Beginning with the first *Kato* inquiry, the activity to which Bardales's employment was

directed was governmental. As *Kato* and subsequent decisions in this court make clear, "the

focus of the inquiry ought to be on the employer's *general* actions[.]" *Hijazi*, 689 F. Supp. 2d at

674 (emphasis added); *Kato*, 360 F.3d 106 at 111 (Second Circuit did not focus solely on TMG's

activities as they related to the Plaintiff specifically, but instead looked more broadly and

"consider[ed] whether TMG's activities in New York  were typical of a private party engaged in

commerce.") The employer's actions here were the operation of a consulate, "plainly diplomatic,

and therefore governmental." *Hijazi,* 689 F. Supp. 2d at 675; *See Figueroa*, 222 F. Supp. 2d at 313.

### B.  Bardales's Employment Activities

The second inquiry in this case is trickier. Bardales was not a diplomat or a policy advisor, whose work clearly is intertwined sufficiently with the Peruvian Consulate's governmental activities, but also, he was not a "purely clerical staff" member who more easily fall "within the commercial activity exception." *Hijazi*, 689 F. Supp. 2d at 675.

In his complaint, Bardales characterizes his work at the Consulate as part administrative customer service, and part personal assistant to Merino. However, he indicated that the majority of his time from 2013 to 2015 was spent chauffeuring or running errands for Merino and her family and friends.

Defendants argue that both of Bardales's positions were intertwined with the Consulate's governmental function. Bardales's customer service work, Defendants assert, was critical to the Consulate's mission of providing services and other assistance to Peruvian nationals in the United States and others seeking to travel to or do business in Peru. (Defs. Br. at 8). In support of this position, Defendants submitted email chains demonstrating that Bardales's employment responsibilities involved familiarization with and the performance of sovereign functions. For instance, Defendants submitted email chains demonstrating that the Consulate required Bardales to study and learn the "Guidelines on consular procedures and services" prepared by the Department of Peruvian Communities Abroad and the Peruvian Council of Ministers' and the "'Manual for Improvement of Citizen Services' establishing compulsory guidelines for all entities of the Government in order to improve services to citizens and the provision of public goods and services." (ECF No. 157-8, 157-11). Additional email chains indicate that during his

time at the Consulate, Bardales helped to process Peruvian national identity cards and passport applications, and visited hospitals in the New York area to obtain information on Peruvians being treated. (ECF Nos. 157-6, 157-12, 157-13, 157-15). Bardales also attended public events and activities of the Consulate, where he was expected to provide services to the public. (ECF Nos. 157-1, 157-3, 157-6, 157-9).

Bardales argues that Defendants' submissions confirm that his work for the Consulate was purely clerical. (Pl. Br. at 17–18). He notes that on many of the emails, including those requiring his presence and provision of services at Consulate events, he is CC'd along with all administrative personnel at the Consulate. (*Id.*)

My assessment is that the emails vary in persuasiveness. For instance, that Bardales was asked to familiarize himself with Consulate guidelines and manuals does not mean that his work was beyond that of a secretary or clerk expected to be able to direct the inquiring public to the appropriate Consulate personnel. Relatedly, that Bardales was asked to attend events along with the entire Consulate Staff is unhelpful. However, the emails indicating that Bardales was expected to travel to hospitals to obtain information regarding Peruvian nationals and to provide passport services, do suggest that Bardales's tasks were more intimately intertwined with the Consulate's sovereign mission. In these roles, Bardales actually provided consular services, and served as a direct representative of the Consulate. Although his duties may not have been advisory in nature, they went beyond more removed clerical tasks. Critically, Bardales offers no evidence clarifying that his specific function in performing these more governmental duties was truly clerical.

As for Bardales's personal assistant responsibilities, Defendants argue that Bardales's primary responsibilities were as a chauffeur, an activity that courts in this district have

determined to be integral to effecting the governmental function of a foreign state mission. (Defs. Br. at 10) (citing *Figueroa v. The Ministry for Foreign Affairs of Sweden, et. al*, 222 F. Supp.3d at 315; *Ayekaba v. Ndong*, No. 1:18-cv-12040, 2019 WL8989861 (S.D.N.Y. Nov. 25, 2019), *report and recommendation adopted by*, 2020 WL 1140731 (S.D.N.Y. Mar. 6, 2020)).

In *Figueroa*, plaintiff brought claims for personal injury, discrimination, and retaliation arising out of his employment as an "Office Clerk/Chauffeur" with The Ministry of Foreign Affairs of Sweden (the "Ministry"), and the Permanent Mission of Sweden to the United Nations (the "Mission). 222 F.Supp.3d at 306–07. Defendants moved for dismissal for lack of subject matter jurisdiction, arguing that Defendants had sovereign immunity under the FSIA. *Id.* at 307. Plaintiff argued that the commercial activity exception applied. *Id.* at 311.

Considering the dual *Kato* inquiry, the court determined first, that "the activity to which the plaintiff's employment was directed is undoubtedly governmental." *Id.* at 311–13. The court then considered the extent to which plaintiff's employment relationship was intertwined with Defendants' governmental function. *Id.* at 314–17. The court found that "plaintiff's transportation responsibilities as a chauffeur at the Mission were sufficiently intertwined with the diplomatic function of the Mission such that the employment itself was part of the defendant's sovereign function." *Id.* at 15. Plaintiff spent 80% of his work time as a chauffeur, and in this capacity, he "was responsible for transporting the Swedish Ambassador and the Ambassador's family, Swedish diplomats and their families, and even members of the Royal Family of Sweden." *Id.* The court reasoned that based on these responsibilities, the Mission had entrusted "plaintiff with the safe transport of Swedish dignitaries, an activity integral to effecting the governmental function of the Mission." *Id.*

The court also addressed plaintiff's responsibilities as an office clerk. The court emphasized that plaintiff spent the majority of his time working as a chauffeur and reasoned that "there is no basis to segregate the portions of the plaintiff's employment that could be characterized as purely clerical…because the commercial activity jurisdictional assessment must be made with reference to the plaintiff's course of conduct with the defendants as a whole, which was non-commercial in nature." *Id.*

In *Ayekaba*, the court determined that plaintiff—a driver for the Permanent Mission of Equatorial New Guinea—was similarly situated to the plaintiff in *Figueroa*, and thus, not entitled to the commercial activity exception. 2019 WL 8989861, at *4.

Bardales argues that his case is distinguishable from *Figueroa* and *Ayekaba* because he did not work as a chauffeur only and the nature of the majority of the chauffeuring he did was personal and not in furtherance of the Consulate's mission. However, records submitted by Defendants significantly undermine these representations.

Defendants submitted a summarization of records they assert Bardales produced in discovery, detailing the days and hours and he worked and the locations to which he transported Merino. (ECF No. 156-1). Defendants assert that Bardales produced records only for the employment period between March 2014 and October 2015. (Defs. Br. at 12). According to Defendants' submission, Bardales worked a total of 380 days during that time period. (*Id.*). On 324 of those days, Bardales drove to exclusively official destinations. On only 56 days did Bardales drive to destinations that were arguably personal. (*Id.*)

Bardales does not dispute the accuracy of Defendants' submission, however, he argues that the time period Defendants' selected is too narrow since he began working for Merino in May 2013. (Pl. Br. at 16). However, Bardales does not state that he provided Defendants with records

encompassing his May 2013 to March 2014 employment, and indeed, does not produce for the court those absent records with his opposition. Bardales also makes no assertions that the absent records would reflect a different ratio of official to personal destinations.

Bardales also argues that the records do not reflect other personal errands he ran while employed by Merino, or the instances where he drove Merino's personal friends to events. Bardales asserts that his employer instructed him not to include the latter in his reports. Again, however, Bardales makes no allegations that including these other job components would show that Bardales spent a significant amount of his time as a personal assistant/chauffeur, let alone a majority of his time, on these more personal tasks. Based on the allegations and record evidence before me, Bardales's case is similar to *Figueroa*, the most significant difference being that Bardales spent more time than the Figueroa plaintiff on non-chauffeuring duties. However, as discussed above, a significant portion of these non-chauffeuring duties were intertwined with the Consulate's governmental function. Considering the extensive driving Plaintiff did transporting the Ambassador to official destinations, and the governmental customer service work performed by Bardales, I find that the employment relationship here was non-commercial in nature and thus, that the Consulate is entitled to immunity under the FSIA.

In arguing the contrary position, Bardales relies predominantly on *Zveiter v. Brazilian Nat. Superintendency of Merchant Marine*, 833 F.Supp. 1089 (S.D.N.Y. Oct. 14, 1993) and the legislative history of the FSIA. In *Zveiter*, the court concludes that the Brazilian National Department of Waterway Transportation's hiring of a plaintiff, a secretary, was commercial in nature because it was not an activity "peculiarly sovereign in nature." *Id.* at 1093–94. In other words, *Zveiter* does not divide its analysis into the two-pronged inquiry now mandated by *Kato*, which requires courts to examine separately a foreign sovereign's conduct and a plaintiff's

interactions with the sovereign. *Zveiter* is distinguishable also in that, based on the text of the opinion, there is no indication that plaintiff performed duties that were outside the scope of the work of a secretary and clearly commercial.

*Zveiter* relies on the same legislative history that Bardales argues supports his case. *Zveiter* and Bardales cite the Report of the House Judiciary Committee, stating that "'the employment of American citizens or third country nationals [as civil service personnel] by the foreign state in the United States,' in contrast to the employment of citizens of the foreign sovereign, 'would be commercial.'" *Id.* at 1093 (alteration in original) (quoting H.R. Rep. No. 94–1487, 94th Cong., 2nd Sess. 16 (1976)). The same report provides examples of what Congress understood to be governmental and commercial activities. Government activities include "the employment of diplomatic service, or military personnel" and commercial activity to include "employment or engagement of laborers, clerical staff or public relations or marketing agents." H.R.Rep. No. 94–1487, at 16.

From this legislative history and *Zveiter*, Bardales seems to suggest that Congress intended for any American citizen not impacting sovereign law or policy to be able to take advantage of the commercial activity exception. First, "the examples of commercial employment in the legislative history… are not outcome determinative" and furthermore, do not suggest the "law or policy" distinction Bardales asserts. *See Figueroa*, 222 F. Supp. 3d at 315. Indeed, "[t]he FSIA's legislative history indicates that Congress intended the FSIA to give 'courts…a great deal of latitude in determining what is a 'commercial activity' for purposes of [the FSIA].'" *Figueroa*, 222 F.Supp.3d at 310 (quoting *Kato*, 360 F.3d at 110) (alterations in original) (quoting H.R. Rep. No. 94-1487, at 16). And second, this position is entirely inconsistent with *Figueroa*, which also involved an American citizen not impacting law or policy.

For the reasons stated above, the Consulate is entitled to immunity.

## IV. VCCR and Consular Immunity

"Article 43(1) of the Vienna Convention provides that '[c]onsular officers and consular employees shall not be amenable to the jurisdiction of the judicial or administrative authorities of the receiving State in respect of acts performed in the exercise of consular functions.'" *Park v. Shin*, 313 F.3d 1138, 1141 (9th Cir. 2002) (quoting Vienna Convention on Consular Relations, Apr. 24, 1963, art. 43(1), 21 U.S.T. 77, 104).  Defendants argue that the claims against Merino also must be dismissed for lack of subject matter jurisdiction because she is immune under the VCCR.

Pursuant to the VCCR, "consular officers and employees are only entitled to immunity 'in respect of acts performed in the exercise of consular functions.'" *Rana v. Islam*, 305 F.R.D. 53, 60 (S.D.N.Y. 2015) (quoting VCCR art. 43(1), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261). To determine whether consular immunity applies, courts in this District apply a "two-part inquiry." *Ford v. Clement*, 834 F.Supp.72, 75 (S.D.N.Y. 1993). "First, the court must determine whether the official's actions 'implicated some consular function.'" *Rama*, 305 F.R.D. at 60 (quoting Ford, 834 F.Supp. at 75). Second, the court must determine whether the acts for which the consular officials seek immunity" were "performed in the exercise of the consular functions in question." *Ford*, 834 F. Supp. at 75.

Article 5 of the VCCR enumerates 12 specific consular functions and a "catch-all" provision defining consular functions to include:

> any other functions entrusted to a consular post by the sending State which are not prohibited by the laws and regulations of the receiving State or to which no objection is taken by the receiving State or which are referred to in the international agreements in force between the sending State and the receiving State.

21 U.S.T. at 82–85 (art 5(a)–(m)). This court has determined that "the management and supervision of…consular staff" is a consular function encompassed by Article 5's catch-all provision. *Ford*, 834 F. Supp. at 75.

There is no dispute that Merino, identified as the Consul General of Peru in New York, was a consular officer. *See* (SAC at ¶ 25). Defendants argue Merino is entitled to immunity because Bardales's claims all implicate her management and supervision of him within the scope of his employment by the Consulate, and the conduct of hers that Bardales challenges was in furtherance of that consular function. (Defs. Br. at 15–16). Specifically, that all wrongful acts allegedly committed by Merino—failure to pay Bardales the overtime to which he was entitled and "keep records required by the FLSA," "failure to provide [Bardales]…wage notices" and "accurate statements of wages," breach of Bardales's employment contract providing for set hours and overtime payment, and retaliatory termination after Bardales requested overtime compensation"—would have been performed in furtherance of the Ambassador's management and supervision of Bardales as a Consulate employee. (*Id.*) (quoting SAC ¶¶ 91–126).

In his opposition, Bardales seems to argue that the personal work he did for Merino and her treatment of him as an employee, were separate from his work for the Consulate, and thus, did not implicate a consular function. (Pl. Br. 18–19). As evidence, Bardales points to two checks he received from Ambassador Merino and submitted to the court with his complaint. (SAC at Ex. A). Although unclear from his brief, presumably, Bardales believes the checks demonstrate that the personal work he did for Merino was compensated separately from his work at the Consulate. *See* (Pl. Br. at 19).

Bardales's argument contradicts the text of his complaint, in which there exists no allegation that Ambassador Merino employed Bardales separately as a personal employee.

Rather, Bardales states that he consistently worked under a Consulate employment contract, that outlined his required schedule and fixed rate of pay. (SAC at ¶ 67). Bardales specifically alleges that his employment as a whole was supposed to be split "50/50" between his duties "working in customer service on behalf of the Consulate and…working as a chauffeur on behalf of [Merino]." (SAC ¶ 53). Both sets of duties, however, were under the same employment contract with the Consulate.

As for the checks, Bardales explains these differently in his complaint as well. The checks state that they are payment for extra hours worked by Bardales for Merino. (SAC at Ex. A). However, Bardales alleges that the checks are compensation for the personal expenses, such as gas, that he incurred while transporting Merino. (SAC ¶ 80). According to Bardales, Merino forced him to sign a receipt stating that these checks were for overtime pay. (*Id.*) There is no allegation that the checks were payment for the personal chores Bardales performed.

Based on his complaint, Bardales understood the work, even the personal chores, he did for Merino to be encompassed by his employment contract with the Consulate. He does not allege that he was not paid for the personal errands he ran specifically, but rather that he is owed overtime and wage statements for the additional hours over his contracted-for hours that he worked for the Consulate. *See* (SAC ¶ 64).  Those additional hours could include personal work for Merino or official chauffeuring for Merino or even customer service work at the Consulate. That Bardales was paid for the personal work he did for Merino pursuant to his contract with the Consulate distinguishes this case from others in which consular officers sought immunity for employment-related claims brought by individuals they hired to provide domestic services in their home. *See Rana v. Islam*, 305 F.R.D. 53 (S.D.N.Y. 2015); *Park v. Shin*, 313 F.3d 1138 (9th Cir. 2002). Based on this distinction, I find that Merino's consular function of managing

Consulate employees is implicated here, and the wrongful payment-related actions she allegedly

took, are in furtherance of this function. Accordingly, Merino is entitled to immunity.

**V. Conclusion**

       Because I conclude that both Defendants are immune, I need not address Defendants'

additional argument that dismissal is appropriate pursuant to Fed. R. Civ. P. 12(b)(6).

       Defendants' motion is GRANTED in its entirety and this matter is dismissed.

**SO ORDERED.**

Dated: New York, New York
September 28, 2020

_____

Hon. Andrew L. Carter, Jr.
United States District Judge